UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DOEREN MAYHEW & CO., P.C.,

    Plaintiff

v.                                                                     Case No. 05-71782
                                                                       Hon. Sean F. Cox

CPA MUTUAL INSURANCE COMPANY OF
AMERICA RISK RETENTION GROUP,

    Defendant.
_____

## OPINION AND ORDER

This matter is before the Court on Cross Motions for summary judgment. Both parties fully briefed the issues, including supplemental briefing, and a hearing was held October 12, 2006. For the following reasons, the Court **DENIES** in part, and **GRANTS** in part, Plaintiff's Motion for summary judgment. Plaintiff's Motion is denied with respect to its claim to recover Claims Expenses in the amount of $1,205,934.18; Plaintiff's Motion is granted with respect to its request for a declaratory judgment that Defendant has a duty to defend the proceeding before the Michigan licensing agency. The Court **GRANTS** in part, and **DENIES** in part, Defendant's Motion for summary judgment. Defendant's Motion is granted with respect to Plaintiff's claims of: (1) breach of policy agreement; (2) unfair trade practices; and (3) violation of Michigan insurance statutes. Defendant's Motion is denied inasmuch it alleges that the $25,000 limit

applies to Plaintiff's claim for the Michigan licensing agency proceeding.

## I. BACKGROUND

This is an insurance action arising out of the failure to pay costs associated with a Securities and Exchange Commission ("SEC") proceeding and a Michigan Department of Labor & Economic Growth, Bureau of Commercial Services ("Michigan licensing agency") proceeding against Plaintiff.

Plaintiff is a certified public accounting firm. Defendant is an insurance company that provided Plaintiff professional liability insurance.

Plaintiff, along with another accounting firm, Grant Thornton, provided auditing services for MCA Financial ("MCA"). In early 1999, less than a year after Plaintiff and Grant Thornton rendered services, MCA filed for bankruptcy. Several criminal and civil actions followed against MCA. Six civil lawsuits were filed against Plaintiff and Grant Thornton, asserting they contributed to the alleged fraud committed by MCA by approving MCA's financial statements. None of the suits resulted in liability against Plaintiff. Defendant paid the defense fees Plaintiff incurred as a result of the MCA civil litigation.

The claim stemming from the MCA litigation was made during the policy year ending June 30, 1999. At the time the claim was made, the 1998 Policy Form was in effect. However, in June 1999, prior to the end of the policy year, Defendant adopted the 1999 Policy Form. The 1999 Policy Form provided broadened coverage in some areas. The broadened coverage provisions applied immediately.

On January 9, 2003, an attorney with the SEC notified Plaintiff that administrative proceedings may be instituted against Plaintiff and two of its accountants. An action was filed

applies to Plaintiff's claim for the Michigan licensing agency proceeding.

## I. BACKGROUND

This is an insurance action arising out of the failure to pay costs associated with a Securities and Exchange Commission ("SEC") proceeding and a Michigan Department of Labor & Economic Growth, Bureau of Commercial Services ("Michigan licensing agency") proceeding against Plaintiff.

Plaintiff is a certified public accounting firm. Defendant is an insurance company that provided Plaintiff professional liability insurance.

Plaintiff, along with another accounting firm, Grant Thornton, provided auditing services for MCA Financial ("MCA"). In early 1999, less than a year after Plaintiff and Grant Thornton rendered services, MCA filed for bankruptcy. Several criminal and civil actions followed against MCA. Six civil lawsuits were filed against Plaintiff and Grant Thornton, asserting they contributed to the alleged fraud committed by MCA by approving MCA's financial statements. None of the suits resulted in liability against Plaintiff. Defendant paid the defense fees Plaintiff incurred as a result of the MCA civil litigation.

The claim stemming from the MCA litigation was made during the policy year ending June 30, 1999. At the time the claim was made, the 1998 Policy Form was in effect. However, in June 1999, prior to the end of the policy year, Defendant adopted the 1999 Policy Form. The 1999 Policy Form provided broadened coverage in some areas. The broadened coverage provisions applied immediately.

On January 9, 2003, an attorney with the SEC notified Plaintiff that administrative proceedings may be instituted against Plaintiff and two of its accountants. An action was filed

which Plaintiff later settled. As part of the settlement, Plaintiff was censured and ordered to disgorge the fees it earned. Plaintiff was also ordered to pay prejudgment interest. Plaintiff also agreed to implement certain policies and procedures to improve the quality of its public audit practice.

Defendant claims that by May 17, 2003, it informed Plaintiff that the SEC proceeding was only covered as a supplemental benefit. The policy provided the maximum payment would be $25,000. The parties dispute whether the SEC proceeding constituted a "claim" for purposes of Plaintiff's policy. The liability limits on "claims" is $10,000,000.[1] The parties also disagree on whether the broadened coverage of the 1999 Policy Form applies to the SEC proceeding.

Additionally, there were proceedings instituted by the State of Michigan that Plaintiff asserts is also covered by its policy as a "claim."

On May 5, 2005, this action was removed from state court. On March 23, 2006, Plaintiff filed a First Amended Complaint alleging Defendant: (1) breached the policy agreement; (2) committed unfair trade practices; and (3) violated Michigan insurance statutes. Plaintiff seeks a monetary judgment against Defendant.

## II.   STANDARD OF REVIEW

Under Fed. R. Civ. P 56(c), summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Copeland v. Machulis*, 57 F.3d 476, 478 (6th Cir. 1995). A fact is "material" and precludes a grant of summary judgment if "proof of that fact would have

---

[1] The policy limit is $20,000,000 under the 1999 Policy Form.

[the] effect of establishing or refuting one of the essential elements of the cause of action or defense asserted by the parties, and would necessarily affect application of appropriate principle[s] of law to the rights and obligations of the parties." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984). The court must view the evidence in the light most favorable to the nonmoving party and it must also draw all reasonable inferences in the nonmoving party's favor. *Cox v. Kentucky Dept. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995).

### III.  ANALYSIS

#### A.  Which Policy Form Applies to the SEC Proceeding?

The parties agree that the 1999 Policy Form was adopted in June 1999, and that any broadened coverage provisions immediately applied. However, the parties dispute whether that broadened coverage applied to claims existing before the adoption, *i.e.* Plaintiff's claim for its costs incurred as a result of the SEC proceeding. The parties apparently agree that the SEC proceeding is interrelated with the MCA claim, as defined in the policy. While Plaintiff does not explicitly concede the SEC proceeding is interrelated, it does note that Defendant declared they are interrelated, and Plaintiff fails to argue otherwise. [Motion, p.8]. The SEC claim relates back to the first made MCA claim noticed on January 28, 1999. The disagreement between the parties is whether the phrase "the broadened coverage will immediately apply to this Policy" from the 1999 Policy Form means that the broadened coverage applies only to claims filed after the date of the adoption, or applies to all matters subsequent to the adoption. The interpretation of an insurance contract is a question of law. *Cole v. Auto Owners Insurance Company*, 272 Mich.App. 50, 52 (Mich.App. 2006).

Plaintiff contends that the 1999 Policy Form applies to the SEC proceeding. Plaintiff

4

cites a letter sent by Defendant on May 18, 2000 in which Defendant stated that the 1999 Policy Form applied to Plaintiff's claim involving MCA.  Plaintiff also submits several letters from June 2001 to February 2002 referring to language from the 1999 Policy Form as governing.

Defendant argues that the conclusion that the 1999 Policy Form applied was a mistake. [Response, p. 8].  It contends the correct interpretation is that the broadened coverage of the 1999 Policy Form only applied prospectively.  Defendant further argues that extrinsic evidence, *i.e.* correspondence, cannot be used to alter the terms of the policy.  It relies on *City of Grosse Pointe Park v. Michigan Municipal Liability and Property Pool*, 473 Mich. 188 (2005).  However, that case held that while extrinsic evidence may not be used to define unambiguous terms, it is admissible to resolve latent ambiguities.  *Id*. at 198.  The Court in *Grosse Pointe Park* defined a latent ambiguity as one "that does not readily appear in the language of the document, but instead arises from a collateral matter when the document's terms are applied or executed."  *Id*.(citing BLACK'S LAW DICTIONARY, (7th ed.)).

Insurance contracts are read as a whole and are accorded their plain and ordinary meaning.  *Cole*, 272 Mich.App. at 53.  "A contract is ambiguous when its words may reasonably be understood in different ways."  *Id*.  If an ambiguous term exists in the contract, courts should generally construe the term against the contract's drafter, unless the drafter presents persuasive extrinsic evidence that the parties intended a contrary result."  *Id*.

Here, the phrase "will immediately apply to this Policy" is ambiguous.  It is not clear from this phrase if the broadened coverage applies to unresolved claims at the time of the adoption, or whether it only applies to claims first filed after the adoption.  The ambiguity must be resolved in Plaintiff's favor.  Defendant is the drafter of the contract and Defendant fails to

5

present extrinsic evidence of what the parties intended.  Additionally, Plaintiff does present extrinsic evidence that Defendant, at least initially, construed the language in the manner Plaintiff asserts.  Thus, the 1999 Policy Form applies to the SEC proceeding, to the extent it broadens coverage over the 1998 Policy Form; the 1998 Policy Form governs in all other respects.

      **B.**      **Is the SEC Proceeding a "Claim?"**

The 1999 Policy Form defines a "claim" as "a written demand received by You for money or services naming You and alleging an act or omission, in the rendering of Professional Services.  A demand shall include the service of suit or the institution of arbitration proceedings against You." [Motion, Exhibit B].

Plaintiff contends that pursuant to the 1999 Policy Form, disciplinary proceedings instituted by the SEC constitute a claim if there is a demand for money or services.   Defendant argues an SEC proceeding does not constitute a "claim" unless it includes a suit or arbitration and a written demand for money or services.

      **1.**      **Suit or Arbitration**

Defendant argues that the SEC proceeding could not constitute a claim under the 1999 Policy Form because it did not "include the service of suit or the institution of arbitration proceedings" against Plaintiff.  Plaintiff contends Defendant is precluded from raising this as a defense because it was not included in Defendant's reasons for denial of coverage.  Alternatively, Plaintiff claims the action by the SEC was a "suit."

"Generally, once an insurance company has denied coverage to an insured and stated its defenses, the insurance company has waived or is estopped from raising new defenses." *Kirschner v. Process Design Associates, Inc.*, 459 Mich. 587, 593 (1999).  However, the doctrine

is limited and "will not be applied to broaden coverage of a policy to protect the insured against risks that were not included in the policy..." *Id*. In *Ruddock v. Detroit Life Insurance Company*, 209 Mich. 638 (1920), the court held that applying the doctrine of estoppel and waiver where an insurance company is not trying to forfeit the contract but rather insisting on enforcing the terms of the contract is inappropriate. Applying the doctrines in that situation would result in the defendant being made to cover a loss that was not contemplated by the agreement.

Consequently, because Defendant is merely asserting the terms of the contract, which state that the demand must "include the service of suit or the institution of arbitration proceedings," the doctrines of estoppel and waiver are inapplicable. Otherwise, as held in *Ruddick*, Defendant could be forced to cover a loss not contemplated by the terms of the agreement, which require that there be service of a suit or arbitration proceedings.

However, Plaintiff's alternative argument that the SEC proceedings constituted a suit is correct. In *Michigan Millers Mutual Insurance Company v. Bronson Plating Company*, 445 Mich. 558, 571 (1994)(*overruled on other grounds*), the court held that the term "suit" when undefined in an insurance contract is ambiguous, and "capable of application to legal proceedings initiated in other than a traditional court setting." In *Bronson*, the court found that a letter from the Environmental Protection Agency identifying the plaintiff as a party potentially responsible for pollution was sufficient to constitute initiation of a suit. The court also noted that other courts have found administrative proceedings to constitute a suit for purposes of an insurance policy. *Id*. at 571 n.10 (citing cases). Likewise, the SEC and Michigan licensing agency proceedings in this case constitute a "suit."

      **2.**      **Written Demand for Money or Services**

a.      money

On January 20, 2004, the SEC issued an Administrative Proceeding Order against Plaintiff. [Motion, Exhibit O]. Defendant asserts the Order was not a written demand for money or services. The Order indicated Plaintiff may have to pay disgorgement. The parties dispute whether disgorgement of the fees earned by Plaintiff for services provided to MCA constitute a demand for "money" as contemplated by Plaintiff's Policy.

The issue is whether disgorgement is "money" for purposes of constituting a claim under the 1999 Policy Form. Money is not a defined term in the 1998 or 1999 policy. Under Michigan law, the court applies the specific language set forth in the insurance policy where that language is clear. *South Macomb Disposal Authority v. American Ins. Co.,et al*, 225 Mich.App. 635, 657 (Mich.App. 1998). However, if the policy does not define a term, the term is interpreted in accordance with its commonly used meanings. *Id*. The district court may also look to relevant dictionary definitions of the term; decisions of courts that have previously interpreted the term; standards and practices within the relevant industry; and how the parties' actions during the pendency of the agreement have reflected an understanding of the term. *City of Wyandotte v. Consolidated Rail Corporation*, 262 F.3d 581, 586 (6th Cir. 2001).

Plaintiff relies on *Securities and Exchange Commission v. Rind*, 991 F.2d 1486, 1493 (9th Cir. 1993), for the proposition that disgorgement is money. That case dealt with an action brought by the SEC against the defendant for securities fraud. In *Rind*, the court held that although disgorgement is a claim for money in the literal sense, disgorgement was still equitable in nature, precluding a jury trial. The court also found that disgorgement was not "money damages" for purposes of 28 USC §2415(b). *Rind*, 991 F.2d at 1492-1493. Rather, the court

held disgorgement is a form of injunctive relief.

The *Rind* court relied on *Securities and Exchange Commission v. Commonwealth Chemical Securities*, 574 F.2d 90 (2nd Cir. 1978). In *Commonwealth*, the SEC sought injunctive relief, including disgorgement, against the defendant. In arguing for a jury trial, the defendant contended that "money is money, whether it be characterized as damages or disgorgement." *Id*. at 95. The court was unpersuaded and held that "in an action brought by the SEC to enjoin violations of the securities laws...the court is not awarding damages to which plaintiff is legally entitled but is exercising the...discretion to prevent unjust enrichment." *Id*. The court noted that "while from the standpoint of a defendant in an action for violation of the securities laws there may be no great difference between paying money in response to a private suit for damages and in a SEC action for injunction and disgorgement...the suit by the SEC is decidedly more analogous to the traditional jurisdiction of equity to award restitution." *Id*. at 95.

The Court finds that a demand for disgorgement of fees by the SEC does not constitute money for purposes of the 1999 Policy Form because it is a demand for equitable relief in order to prevent unjust enrichment. The term money in the 1999 Policy Form is reasonably read to refer to money when it is requested in the legal sense. This is supported by the context in which the word money is used, *i.e.*, it must be part of a demand that includes a "suit or institution of arbitration proceedings." The SEC's demand of disgorgement was not a request for money in the legal sense. See *Rind* and *Commonwealth*, *supra*.

In addition to the demand for disgorgement, Plaintiff alleges that there was discussion during settlement with the SEC of remuneration to the MCA investors which constitutes "money" for purposes of the 1999 Policy Form. Plaintiff refers the Court to an email from Mark

9

Crawford, Plaintiff's managing director, to shareholders, stating that the SEC may accept $500,000 in addition to disgorgement of fees to settle the action. [Response, Exhibit 8]. But, Plaintiff does not provide any evidence of a written demand by the SEC against Plaintiff for such relief. An email generated by Plaintiff does not constitute a written demand for money.

Lastly, Plaintiff contends that the SEC sought all remedial action necessary and appropriate which Plaintiff states includes "orders concerning payments to investors." [Motion, Exhibit O, p.19]. However, the sentence referred to by Plaintiff reads that the SEC will institute proceedings to determine "[w]hat, if any, remedial action is necessary and appropriate *pursuant to Rule 102(e) of the Commission's Rules of Practice*." *Id*. The rule cited by the SEC is 17 CFR §201.102(e), which contemplates suspension and disbarment, and not a demand for money.

Accordingly, Plaintiff fails to establish that there was a written demand for money.

### b. services

Plaintiff alleges that there was a written demand for services based on the policies and procedures outlined in the settlement agreement with the SEC. [Motion, Exhibit R; and Motion, p.11]. The alleged services are referred to as "undertakings." The undertakings were considered by the SEC in deciding whether to accept the offer of settlement.

"Service" is an undefined term in the 1999 Policy Form. The term "Professional Services" is used in the same sentence as "service." Professional Services are defined in the 1999 Policy as:

> ...advice given or services performed of whatsoever nature in the practice of public accountancy. Undertaken by or on behalf of the Named Insured or by an Affiliated Firm so named in the declarations, or any other person or entity for whose conduct the Named Insured is legally responsible, so long as the services are not otherwise excluded by this Policy, whether assumed by contract or

> otherwise, provided always that the fee or portion of the fee, unless the work is pro-bono, accruing from such work shall inure to the benefit of the Named Insured or Affiliated Firm. Professional Services also means advice given or services performed in connection with any institute of accountants or any standards board or any similar professional body whether or not on behalf of the Named Insured Firm.

As Plaintiff points out in its supplemental brief, Defendant uses the word "service" throughout the 1999 Policy Form with different modifiers. Clearly, "services" is used in its most general sense in the definition of a claim under the 1999 Policy Form. The dictionary defines "service" as "employment duties or work for another;" the "performance of work or duties for a superior or as a servant;" "work done for others as an occupation or business;" and "an act or a variety of work done for others, especially for pay..." AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE: 4th ed. (2000).

Defendant contends the undertakings in the SEC order are not "services" but rather internal quality control measures. Further, Defendant claims the SEC did not demand that Plaintiff undertake the reforms.

The commonality in the definitions of the word "service" is that a service is done directly for the benefit of others. Here, the undertakings identified by Plaintiff as services are for the direct benefit of Plaintiff. They all relate to improving the quality of Plaintiff's public auditing service by ensuring it will not commit more violations. The alleged "services" are more properly characterized as *acts* done to improve the quality of Plaintiff's services. Moreover, Section IV of the SEC Settlement lists the actions which are Ordered, it does not include any reference to the undertakings. [Motion, Exhibit R]. The undertakings were arguably not demanded by the SEC.

Plaintiff fails to establish there was a written demand for services.

### C.     Is the SEC Proceeding a "Claims Expense?"

Plaintiff argues that if the SEC proceeding is not a claim, it is properly considered a "claim expense" of the MCA litigation because settlement with the SEC was delayed in order to avoid affecting the outcome of that litigation.  There is no dispute that the MCA litigation constituted a claim under Plaintiff's policy.

The 1999 Policy Form defines "claim expenses" as "those fees charged by an attorney we designate to consent to, and all other fees, costs and expenses resulting from the investigation, adjustment, expert analysis, defense and appeal of a Claim, if incurred by us or by You with our written consent." [Motion, Exhibit B].

Defendant argues that the advice to delay settlement came from one attorney, Steve Susser, while another attorney, Michael Mann, advised that settlement would not affect the MCA litigation.  In its Reply, Plaintiff states that it "a non-lawyer, can hardly be criticized for following the more conservative of the conflicting legal advice." [Reply, p. 5].  This indicates that Plaintiff recognized it had a choice and that it was not required by Defendant to delay settlement for the benefit of the MCA litigation.

Thus, Plaintiff's choice to delay settlement with the SEC does not transform the costs associated with that delay into a "claims expense" as defined by the policy.

### D.     Michigan Proceedings

Plaintiff argues that an ongoing proceeding before the Michigan licensing agency that arises out of the SEC claim is a claim expense covered by the policy with Defendant.  The Michigan licensing agency indicated it could order Plaintiff to pay a $10,000 fine. [Motion, Exhibit GG, p.3].

Although civil fines are excluded as damages under the 1999 Policy Form, Defendant nonetheless has a duty to defend. The 1999 Policy Form broadened the Defendant's duty to defend. The 1998 Policy Form limited the duty to defend to "any suit against the Insured *seeking damages* which are payable under the terms of this Policy..." [Motion, Exhibit A, p.1](emphasis added). However, the 1999 Policy Form states that Defendant has "the right and duty to defend *any Claim*..." [Motion, Exhibit B, p.3](emphasis added). The coverage is broader because under the 1999 Policy Form, Defendant agrees to defend any claim. A claim is defined as a written demand for money or services; money is not limited to damages defined in the policy.

Defendant's Vice President of Claims, William Keeling, admitted that the 1999 Policy Form broadened the duty to defend to include all claims as opposed to only suits for damages.

> Q. And I do want to focus on the duty to defend. Is what you just said applicable as well to the duty to defend, that is that it is broader under the June '99 policy form?
>
> A. Again, the coverage agreements speak for themselves. The policies speak for themselves as to what the requirements are. All the requirements of both policies have to be met when analyzing coverage in the context of a specific situation, but generally speaking I think one could probably make the scope of the coverage agreement in 6/99 policy as to defense might be broader in the general context than the 3/98 edition.
>
> Q. And is one of the aspects in which the scope of the duty to defend is broader in the June '99 Policy Form because the duty to defend applies to all claims whereas the duty to defend in the March '98 policy might be argued to be limited to suits seeking damages where the damages are within the duty to pay coverage?
>
> A. Again, the coverage agreements speak for themselves, what - the coverage outcome in a specific case might vary depending on the facts of the specific situation, but generally speaking that is a difference between the two policies, yes.
>
> . . .

13

> Q. Now, for purposes of the scope of the duty to defend, must the money demanded be money that if owed is payable under the policy, or does it also include money that might be excluded from payment under the policy?
>
> A. There is a distinction between the way the 3/98 and 6/99 coverage agreement [sic] approach what triggers coverage. You have to have a claim under the 6/99 policy in order for coverage to be triggered.

[Motion, Exhibit E, pp.53-56].

"Under Michigan law, courts construe an insurer's duty to defend more broadly than its duty to indemnify." *Cincinnati Insurance Company v. Zen Design Group*, 329 F.3d 546, 552 (6th Cir. 2003). The Court recognizes that the general rule is that an insurer "only has a duty to defend the insured if the charges against the insured in the underlying action arguably fall within the language of the policy." *Id*. (citation omitted). However, there is nothing that prevents an insurer from contracting around this general rule. Here, the 1998 Policy limited the duty to defend to suits seeking damages as defined in the policy, consistent with the general rule. But, in the 1999 Policy, the duty to defend was limited to all claims; claims are limited to demands for money or services, not just damages defined under the policy.

Thus, Defendant has a duty to defend the Michigan proceeding arising from the SEC action, which arose from the MCA litigation, because the Michigan proceeding constitutes a claim under the 1999 Policy Form. There was a written demand for money by the Michigan licensing agency against Plaintiff, in the form of a $10,000 fine. [Motion, Exhibit EE and GG]. Unlike the demand for disgorgement by the SEC, which was a request for equitable relief, not money in the legal sense - the Michigan agency seeks monetary legal relief. See *U.S. v. Telluride Company*, 146 F.3d 1241, 1245-1246 (10th 1998)("actions for equitable relief typically are not

14

actions for penalties or fines")(citing *Hartford-Empire Company v. U.S.*, 323 U.S. 386, 435 (1945)("relief in equity is remedial, not penal")).

Accordingly, Defendant is not obligated to pay the $10,000 fine as it is excluded from coverage, but does have a duty to defend in the action against Plaintiff brought by the Michigan licensing agency.

### E.   Michigan Statutory Violations

Plaintiff also alleges statutory violations against Defendant. Plaintiff alleges violations of MCL 500.2006(1) and (4); and violations of MCL 500.2026(b), (g) and (n). [Amended Complaint, ¶29]. Defendant is entitled to summary judgment on Plaintiff's claims because there is no independent cause of action for an insured under either statute. See *Young v. Michigan Mutual Insurance Company*, 139 Mich.App. 600, 605 (Mich.App. 1984) and *Frankenmuth Mutual Insurance Company v. Keeley*, 433 Mich. 525, 562 (1989).

### V.   CONCLUSION

For the foregoing reasons, the Court **DENIES** in part, and **GRANTS** in part, Plaintiff's Motion for summary judgment. Plaintiff's Motion is denied with respect to its claim to recover Claims Expenses in the amount of $1,205,934.18; Plaintiff's Motion is granted with respect to its request for a declaratory judgment that Defendant has a duty to defend the proceeding before the Michigan licensing agency. The Court **GRANTS** in part, and **DENIES** in part, Defendant's Motion for summary judgment. Defendant's Motion is granted with respect to Plaintiff's claims of: (1) breach of policy agreement; (2) unfair trade practices; and (3) violation of Michigan insurance statutes. Defendant's Motion is denied inasmuch it alleges that the $25,000 limit applies to Plaintiff's claim for the Michigan licensing agency proceeding.

**IT IS SO ORDERED.**

                                              **S/Sean F. Cox**
                                              **Sean F. Cox**
                                              **United States District Judge**

**Dated: January 10, 2007**

**I hereby certify that a copy of the foregoing document was served upon counsel of record on January 10, 2007, by electronic and/or ordinary mail.**

                                              **S/Jennifer Hernandez**
                                              **Case Manager**