UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DOEREN MAYHEW & CO., P.C.,

    Plaintiff

v.                                                                           Case No. 05-71782
                                                                 Hon. Sean F. Cox

CPA MUTUAL INSURANCE COMPANY OF
AMERICA RISK RETENTION GROUP,

    Defendant.
_____

## OPINION AND ORDER

This matter is before the Court on Cross Motions for reconsideration. Both parties fully briefed the issues. For the following reasons, the Court **GRANTS**, in part, and **DENIES** in part, Plaintiff's Motion for reconsideration; and **GRANTS**, in part, and **DENIES** in part, Defendant's Motion for Reconsideration. Based on the Court's reconsideration, Plaintiff's Motion for summary judgment is **GRANTED** in part, and **DENIED**, in part. Likewise, Defendant's Motion for summary judgment is **GRANTED** in part, and **DENIED,** in part. Plaintiff's Motion is granted regarding Plaintiff's claim for breach of policy agreement to the extent it alleges the SEC and Michigan licensing matters constitute claims under its policy with Defendant. It is also granted to the extent that Plaintiff seeks to recover attorney fees paid to Young & Susser, and costs to 'Mr. Murovitz' as claim expenses. Defendant's Motion is granted regarding Plaintiff's claims of unfair trade practices and violation of Michigan insurance statutes.

1

## I. BACKGROUND

This is an insurance action arising out of the failure to pay costs associated with a Securities and Exchange Commission ("SEC") proceeding and a Michigan Department of Labor & Economic Growth, Bureau of Commercial Services ("Michigan licensing agency") proceeding against Plaintiff.

Plaintiff is a certified public accounting firm. Defendant is an insurance company that provided Plaintiff professional liability insurance.

Plaintiff, along with another accounting firm, Grant Thornton, provided auditing services for MCA Financial ("MCA"). In early 1999, less than a year after Plaintiff and Grant Thornton rendered services, MCA filed for bankruptcy. Several criminal and civil actions followed against MCA. Six civil lawsuits were filed against Plaintiff and Grant Thornton, asserting they contributed to the alleged fraud committed by MCA by approving MCA's financial statements. None of the suits resulted in liability against Plaintiff. Defendant paid the defense fees Plaintiff incurred as a result of the MCA civil litigation.

The claim arising from the MCA litigation was made during the policy year ending June 30, 1999. At the time the claim was made, the 1998 Policy Form was in effect. However, in June 1999, prior to the end of the policy year, Defendant adopted the 1999 Policy Form. The 1999 Policy Form provided broadened coverage in some areas. The broadened coverage provisions applied immediately.

On January 9, 2003, an attorney with the SEC notified Plaintiff that administrative proceedings may be instituted against Plaintiff and two of its accountants. An action was filed which Plaintiff later settled. As part of the settlement, Plaintiff was censured and ordered to

2

disgorge the fees it earned from the services provided to MCA. Plaintiff was also ordered to pay prejudgment interest. In addition, Plaintiff agreed to implement certain policies and procedures to improve the quality of its public audit practice.

Defendant claims that by May 17, 2003, it informed Plaintiff that the SEC proceeding was only covered as a supplemental benefit. According to Defendant, under the policy the maximum benefit is $25,000. The parties dispute whether the SEC proceeding constituted a "claim" for purposes of Plaintiff's policy. The liability limits on "claims" is $10,000,000. The parties also disagree on whether the broadened coverage of the 1999 Policy Form applies to the SEC proceeding. Additionally, there were proceedings instituted by the State of Michigan that Plaintiff asserts is also covered by its policy as a "claim."

On May 5, 2005, this action was removed from state court. On March 23, 2006, Plaintiff filed a First Amended Complaint alleging Defendant: (1) breached the policy agreement; (2) committed unfair trade practices; and (3) violated Michigan insurance statutes.

On May 2, 2006, Plaintiff filed a Motion for summary judgment. Defendant filed a cross Motion for summary judgment on May 26, 2006. The Court issued an Order on January 10, 2007, granting in part, and denying in part, both parties' Motions for summary judgment. The Court found that the SEC proceeding was not a claim or claim expense; and that Defendant did have a duty to defend in the Michigan licensing agency proceeding. The Court granted summary judgment on Plaintiff's claims of unfair trade practices and Michigan statutory violations.

On January 23, 2007, Plaintiff filed a Motion for reconsideration. Defendant filed a Motion for reconsideration on January 25, 2007. Plaintiff asks the Court to reconsider its Order and find: (1) Plaintiff did not have choice in delaying settlement with the SEC and choice is not

the appropriate test; (2) the definition of "services" applied by the Court was too narrow; (3) the SEC demanded the undertakings listed in the settlement; (4) the SEC proceedings were not limited to Rule 102(e); (5) prejudgment interest constituted a demand for "money;" (6) disgorgement is "money;" and (7) demand for remuneration for investors qualified as a demand for money even though it was not written. Defendant asks the Court to reconsider its Order and find that it does not have a duty to defend in the Michigan licensing agency proceeding.

## II. STANDARD OF REVIEW

Motions for reconsideration are treated as motions to alter or amend judgment pursuant to Fed.R.Civ.P. 59. *Huff v. Metropolitan Life Ins. Co.*, 675 F.2d 119, 122 (6th Cir. 1982). Under Rule 59, motions may be granted if there is a clear error of law; newly discovered evidence not previously available; an intervening change in controlling law; or to prevent manifest injustice. *Gencorp, Inc. v. American International Underwriters*, 178 F.3d 804, 834 (6th Cir. 1999). Additionally, local rule provides:

> (g) Motions for Rehearing or Reconsideration.
>
> * * *
>
> (3) Grounds. Generally, and without restricting the court's discretion, the court will not grant motions for rehearing or reconsideration that merely present the same issues ruled upon by the court, either expressly or by reasonable implication. The movant must not only demonstrate a palpable defect by which the court and the parties have been misled but also show that correcting the defect will result in a different disposition of the case.

E.D. Mich. LR 7.1(g).

## III. ANALYSIS

The parties did not object to the Court's finding that the 1999 Policy Form applies to the SEC and Michigan licensing agency proceeding to the extent that it broadens coverage over the

4

1998 Policy. The claims will be analyzed under the 1999 Policy to the extent it applies.

A.  Was The SEC Proceeding A "Claim Expense" Because Settlement Was Delayed For The Benefit Of The MCA Litigation?

In the Opinion and Order, this Court found that the defense fees incurred because of the SEC proceeding were not a claim expense of the MCA litigation because the Plaintiff chose to delay the settlement after receiving conflicting legal advice from its MCA litigation counsel and its SEC counsel. Plaintiff argues that "choice" was not the appropriate test and that the Court should look to the terms of the policy.

After reviewing the parties' submission, it appears the Court proceeded on an inaccurate set of facts. Defendant retained Young & Susser, P.C. for the MCA litigation. Plaintiff hired its own counsel for the SEC proceeding. However, Defendant admits that some attorneys "provided services with respect to both the SEC proceedings and the MCA litigation..." [Defendant's Motion for Reconsideration, p.3]. Plaintiff submitted a list of attorney fees showing work by Young & Susser on the SEC matter. [Plaintiff's Motion, Exhibit J]. Plaintiff alleges that settlement discussions regarding the SEC proceeding occurred as early as February 25, 2003. [Plaintiff's Motion, Exhibit T]. On several occasions Defendant articulated its concern that settlement of the SEC proceeding may be adverse to the MCA litigation. [Plaintiff's Motion, Exhibits V-CC]. Defendant does not dispute that attorneys from Young & Susser advised Plaintiff that settling the SEC matter could adversely impact the MCA litigation. Plaintiff received contradictory advice from the counsel it retained separately. Plaintiff did not settle the SEC matter until August 5, 2004, following the July 29, 2004 affirmation of the dismissal of the MCA litigation.

In its argument that the SEC proceeding was a claim expense, Plaintiff quotes from the 1998 Policy Form, which states:

> The term "Claims Expenses" when used in this Policy, shall mean:
>
> (1) Fees charged by any lawyer designated by the Company pursuant to Section 1.B., "<u>Defense (included in the Limits of Liability) and Settlement</u>;"
>
> (2) All other fees, costs, and expenses resulting from the investigation, adjustment, defense, and appeal of Claims if incurred by the Company or with the Company's prior written consent;
>
> (3) Fees charged by any lawyer retained by the Insured with the prior written consent of the Company;
>
> * * *

[Plaintiff's Motion, Exhibit A, p.4].

Defendant relies on the 1999 Policy Form in its Response to Plaintiff's Motion. The 1999 Policy Form defines "Claim Expenses" as follows:

> Claim Expenses are those fees charged by an attorney we designate or consent to, and all other fees, costs and expenses resulting from the investigation adjustment, expert analysis, defense and appeal of a Claim, if incurred by us or by You with our written consent. Claim Expenses do not include salaries of our employees or officers, or fees and expenses of independent adjusters retained by us.

[Plaintiff's Motion, Exhibit A, p.1].

It is irrelevant which Policy Form applies for purposes of this issue, as they provide the same coverage. Under both policies, any legal fees paid to Young & Susser are a claim expense because the MCA litigation was undisputedly a claim; and, as discussed below, the SEC matter is also claim. Young & Susser was retained by Defendant to handle the MCA litigation, and it also participated in the SEC matter to some extent. Young & Susser advised Plaintiff that settling the SEC matter could be detrimental to the MCA litigation. Relying on that advice, Plaintiff did not

6

settle the SEC matter until the MCA litigation was resolved.  The fees charged by Young & Susser for work on the SEC proceeding are a claim expense of the MCA litigation.  Young & Susser were designated or consented to by Defendant.  It handled the MCA litigation and a portion of the SEC matter.  Young & Susser advised Plaintiff not to settle the SEC matter to avoid a negative impact on the MCA litigation.

However, Plaintiff also seeks to bootstrap the legal fees charged by its own separate counsel and associated costs of litigation as a claim expense to the MCA litigation.  The 1998 Policy language relied on by Plaintiff in its Motion for reconsideration states that "[f]ees charged by any lawyer retained by the Insured with the prior written consent of the Company" is a claims expense. [Exhibit A, p.4].  Plaintiff admits in its Motion for reconsideration that its separate attorney "was not retained or approved by CPA Mutual, and was counsel only in the SEC proceeding, not the MCA litigation." [Plaintiff's Motion for Reconsideration, p.3].  It is clear that attorney fees from Plaintiff's separately retained counsel, neither designated nor approved by Defendant, cannot constitute a claims expense.  Further, Plaintiff's Exhibit J identifying the legal charges for the SEC matter show that the legal fees were broken down such that the fees charged by Young & Susser are easily distinguishable.

The 1998 Policy Form relied on by Plaintiff states that "[a]ll other fees, costs, and expenses resulting from the investigation, adjustment, defense, and appeal of Claims if incurred by the Company or with the Company's prior written consent" are claims expenses.  The language is substantially the same in the 1999 Policy Form.  Plaintiff offers a letter from Young & Susser indicating that the fees charged by "Mr. Murovitz" and his firm, procured by Young & Susser, are indistinguishable between the MCA and SEC matters. [Plaintiff's Motion, Exhibit

7

DD]. The charges from Mr. Murovitz's firm constitute claims expenses of the MCA litigation. Plaintiff does not offer evidence that any other fees shown in its Exhibit J were incurred by Defendant or with Defendant's prior written consent.

**B.      Was The Court's Definition of "Services" Too Narrow?**

Neither policy defines "services." In its Order, the Court acknowledged that the policies use "services" in its broadest sense. Relying on common usage and dictionary definitions, the Court ruled that "services" are done for the benefit of others, and the undertakings relied on by Plaintiff were more appropriately considered "acts" done for Plaintiff's own benefit.

Plaintiff contends that the Court erroneously construed "services" narrowly, in favor of the insured. Additionally, Plaintiff asserts that the Court's interpretation of "services" is in conflict with the 1999 Policy definition of "Professional Services" which states:

> Professional Services means advice given or services performed of whatsoever nature in the practice of public accountancy, undertaken by or on behalf of the Named Insured or by an Affiliated Firm so named in the declarations, or any other person or entity for whose conduct the Named Insured is legally responsible, so long as the services are not otherwise excluded by this Policy. whether assumed by contract or otherwise, provided always that the fee or portion of the fee, unless the work is pro-bono, accruing from such work shall inure to the benefit of the Named Insured or Affiliated Firm. Professional Services also means advice given or services performed in connection with any institute of accountants or any standards board or any similar professional body whether or not on behalf of the Named Insured Firm.

[Plaintiff's Motion, Exhibit B, p.2]. The 1998 Policy Form does not define professional services.

"[C]onstruction and interpretation of an insurance contract is a question of law..." *Henderson v. State Farm Fire and Casualty Co.*, 460 Mich. 348, 353 (1999). In this case, the Court interprets the language of the insurance policy and its terms in accordance with Michigan's well-established principles of contract construction. *Id*. "[A]n insurance contract must be

8

enforced in accordance with its terms." *Id*. at 354.  An insurance company will not be held liable for a risk it did not assume. *Id*.  Ambiguities in an insurance contract are construed in favor of the insured. *Id*.  However, the court will not create an ambiguity where the terms of the contract are clear. *Frankenmuth Mutual Ins. Co. v. Masters*, 460 Mich. 105, 111 (1999).  The plain meaning of a word or phrase will not be perverted or given some alien construction merely for the purpose of benefitting an insured. *Henderson*, 460 Mich. at 354.  "The fact that a policy does not define a relevant term does not render the policy ambiguous." *Id*.  "Rather, reviewing courts must interpret the terms of the contract in accordance with their commonly used meanings." *Id*.  Whether contract language is ambiguous is a question of law. *Id*. at 353.  Where there is no ambiguity, the court will enforce the terms of the contract as written. *Masters*, 460 Mich. at 111.

Plaintiff's argument is unavailing.  The Court did not find the term "services" to be ambiguous.  Thus, there was no obligation to construe the term in favor of Plaintiff.  The Court interpreted the plain and ordinary meaning of "services" as a service done directly for the benefit of others, meaning other than Plaintiff.  This is not inconsistent with "Professional Services" which are defined in the 1999 Policy Form as services of whatsoever nature in the practice of public accountancy where the fee inures to the benefit of Plaintiff, unless the work is pro-bono.  The Court's definition of "services" is broader than that because it does not limit the service to the practice of public accountancy.

Plaintiff does not agree with the dictionary definition cited by the Court, instead urging the Court to adopt the definitions offered by Plaintiff.  But, the court does not ascribe ambiguity to words "simply because dictionary publishers are obliged to define words differently to avoid possible plagiarism." *Henderson*, 460 Mich. at 354-355.  The fact that Plaintiff produces

9

materially different definitions of the word "service" does not create ambiguity. *Id*. at 355, n.3.

The Court applied the definition of services to the undertakings set forth in the settlement agreement with the SEC. The Court found that the undertakings were more correctly referred to as acts done to improve the quality of Plaintiff's work. The undertakings are quality control measures not for the direct benefit of others and are not properly characterized as "services." Plaintiff fails to present any issue that was not already ruled on by the Court.

Plaintiff also alleges the Court erred by finding that the SEC did not demand the undertakings. The Court did not make a finding on this issue; the statement that the SEC arguably did not demand the undertakings was dicta. Because the Court does not find the undertakings to be services, it does not reach the question of whether the undertakings were demanded by the SEC.

### C. Was the January 20, 2004 Order From the SEC a Demand For Money?

Plaintiff argues that the Court erred by finding several documents did not constitute a written demand for money. The only document that Plaintiff presents a new argument on is the January 20, 2004 Order instituting proceedings. The Court found that the sentence relied on by Plaintiff in its motion for summary judgment only referred to Rule 102(e) of the Commission's Rules of Practice. Plaintiff now relies on several paragraphs citing to Section 8A of the Securities Act of 1933 and Section 21C of the Securities Exchange Act of 1934 that it argues constitute a demand for money because civil penalties are an available remedy under those sections.

The SEC's demands were clear in its January 20, 2004 Order:

In view of the allegations made by the Division of Enforcement and the Office of

> the Chief Accountant, the Commission deems it necessary and appropriate that public administrative and cease-and-desist proceedings be instituted to determine:
>
> A. Whether the allegations set forth in Section II are true and, in connection therewith, to afford Respondents an opportunity to establish any defenses to such allegations;
>
> B. Whether, pursuant to Section 8A of the Securities Act and Section 21C of the Exchange Act, Respondents should be ordered to cease and desist from committing or causing violations of, and any future violations of, Section 17 (a) of the Securities Act, Sections 10(b), 10A and 15(d) of the Exchange Act and Rules 10b-5, 12b-20 and 15d-1 thereunder and whether Respondents should be ordered to pay disgorgement pursuant to Section 8A(e) of the Securities Act and Section 21C(e) of the Exchange Act; and
>
> C. What, if any, remedial action is necessary and appropriate pursuant to Rule 102(e) of the Commission's Rules of Practice.

[Plaintiff's Motion, Exhibit O, p.19]. The SEC explicitly sought to institute proceedings to determine if Plaintiff should be forced to: (1) cease and desist violations of securities statutes; (2) pay disgorgement; and (3) be subject to remedial action under Rule 102(e). The fact that the SEC *could have* demanded money under other provisions does not transform the order into a written demand for money. However, because the Court finds below that disgorgement is money, the January 20, 2004 Order is a written demand for money.

Plaintiff also makes the argument that Defendant knew the SEC would settle the matter for a payment of $500,000, which is clearly money. Plaintiff argues that even though the settlement offer was not in writing, because Defendant was aware of it, it constitutes a claim. The terms of both policies are clear and unambiguous that a claim requires a *written* demand for money or services. Plaintiff does not offer any authority for abrogating a clear and unambiguous term in the policy.

    D.    **Is Disgorgement Money?**

11

Plaintiff contends that the Court erred by finding that "money" as used in the policy, does not include disgorgement. The Court ruled that the policy meant "money" in the legal sense, and that disgorgement is equitable relief used to prevent unjust enrichment and therefore not money.

Plaintiff does not seek to recover the disgorged fees, as they are clearly excluded as money damages under both the 1998 and 1999 Policy Forms. However, Plaintiff argues that disgorgement is nonetheless "money" in the literal sense, such that it can form the basis of a claim and trigger the duty to defend.

"An insurance policy is much the same as any other contract." *City of Grosse Pointe Park v. Michigan Municipal Liability and Property Pool*, 473 Mich. 188, 197 (2005)(citation omitted). "The cardinal rule in the interpretation of contracts is to ascertain the intention of the parties...[t]o this rule all others are subordinate." *Id*. Contracts are given their plain and ordinary meaning, avoiding technical and constrained constructions. *English v. Blue Cross Blue Shield of Michigan*, 263 Mich.App. 449, 471 (Mich.App. 2004). "Absent an ambiguity or internal inconsistency, contractual interpretation begins and ends with the actual words of a written agreement." *Id*.

Upon reviewing its Order, the Court concedes it did not properly apply the rules of contract interpretation under Michigan law because it relied on a constrained construction rather than the plain and ordinary meaning. The word money in its most plain and ordinary sense means currency. It is defined as "[t]he medium of exchange authorized or adopted by a government as part of its currency; esp. domestic currency." BLACK'S LAW DICTIONARY (8th ed. 2004). Disgorgement is a demand for money. Disgorgement is defined as "[t]he act of giving up something (such as profits illegally obtained) on demand or by legal compulsion." *Id*. The

"something" that Plaintiff had to give up was the money it charged in fees for its work with MCA. Thus, the January 20, 2004 Order from the SEC constitutes a claim under both the 1998 and 1999 Policy Form because it includes a written demand for money, in the form of disgorgement. It is undisputed that although disgorgement is money in the literal sense, it does not constitute money damages under either policy and Plaintiff is not entitled to indemnity on the actual money paid as disgorgement.

Plaintiff also alleges that the prejudgment interest demanded by the SEC in the settlement is "money" for purposes of constituting a claim. Plaintiff did not make this argument in its motion for summary judgment, thus, it is not properly considered in the motion to reconsider.

**E.     Does Defendant Have a Duty to Defend the Disciplinary Proceedings?**

Finding that disgorgement is "money" as contemplated in the definition of a claim does not end the inquiry. Defendant argues, in the context of the Michigan licensing agency proceeding, that it cannot be made to pay defense fees for a claim that only sought relief not covered under the policy. In addition, Defendant contends that the $25,000 supplemental coverage solely applies to disciplinary proceedings. In light of the Court's findings above, these arguments are also applicable to the SEC proceeding.

**1.     Duty to Defend**

In its Order, the Court found that Defendant broadened its duty to defend in the 1999 Policy. The 1998 Policy defined a claim the same as the 1999 Policy, *i.e*. as "a demand for money or services made in writing against the Insured..." [Plaintiff's Motion, Exhibit A, p.4]. However, the 1998 Policy limited the duty to defend to "any suit against the Insured seeking damages which are payable under the terms of this Policy" which is narrower than claims.

[Plaintiff's Motion, Exhibit A, p.1]. The 1999 Policy maintained the same definition of a claim, but eliminated the limitation on the duty to defend. The 1999 Policy limits the duty to defend to "any Claim." [Plaintiff's Motion, Exhibit B, p. 3]. Under the unambiguous terms of the 1998 and 1999 Policies, the duty to defend was broadened from suits seeking only money damages, to suits involving any claim. The definition of a claim did not change substantially between the 1998 and 1999 Policies. Thus, the only reasonable interpretation is that Defendants broadened their duty to defend in the 1999 Policy.

As the Court noted in its Order, the general rule is that an insurer "only has a duty to defend if the charges against the insured in the underlying action arguably fall within the language of the policy." *Cincinnati Ins. Co. v. Zen Design Group*, 329 F.3d 546, 552 (6th Cir. 2003). Defendant asserts that it could not contract around this general rule. Defendant directs the Court to an unpublished case from the Michigan Court of Appeals. *Yale Public Schools v. MASB-SEG Property Casualty Pool*, 2004 WL 2881889 (Mich.App. 2004). In *Yale*, the insured argued that a particular exclusion from coverage did not apply because it required a showing of personal profit or advantage to which the insured was not legally entitled. The court agreed with the insured that the insurer did not make this showing, and the exclusion did not apply. The court did not rule on whether an unambiguous change in the language of a policy broadening its duty to defend should be enforced where it is contrary to a general rule of contract interpretation.

The Michigan Supreme Court recently reiterated the fundamental importance of the freedom to contract.

> **A fundamental tenant of our jurisprudence is that unambiguous contracts are not open to judicial construction and must be *enforced as written*.** Courts enforce contracts according to their unambiguous terms because doing so respects

the freedom of individuals freely to arrange their affairs via contract. This Court has previously noted that 'the general rule of contracts is that competent persons shall have the utmost liberty of contracting and that their agreements voluntarily and fairly made shall be held valid and enforced in the courts.' When a court abrogates unambiguous contractual provisions based on its own independent assessment of 'reasonableness' the court undermines the parties' freedom of contract. * * * This approach, **where judges rewrite the contract is contrary to the bedrock principle of American contract law that parties are free to contract as they see fit, and the courts are to enforce the agreement as written absent some highly unusual circumstance such as a contract in violation of law or public policy**. This Court has recently discussed, and reinforced, its fidelity to this understanding of contract law... The notion, that free men and women may reach agreements regarding their affairs without government interference and that courts will enforce those agreements, is ancient and irrefutable. It draws strength from common-law roots and can be seen in our fundamental charter, the United States Constitution, where government is forbidden from impairing the contracts of citizens. Our own state constitutions over the years of statehood have similarly echoed this limitation on government power. It is, in short, an unmistakable and ineradicable part of the legal fabric of our society.

*Rory v. Continental Ins. Co.*, 473 Mich. 457, 468-469 (2005)(emphasis added); see also *Wilkie v. Auto-Owners Ins. Co.*, 469 Mich. 41, 51-52 (2003). Moreover, "[t]he duty to defend...arises ***solely*** from the language of the insurance contract." *Stockdale v. Jamison*, 416 Mich. 217, 224 (1982)(emphasis added). Defendant does not present any authority demonstrating that this Court committed a palpable defect by ruling that it would enforce the unambiguous contract terms as written which extends the duty to defend to all claims.

In addition, during deposition, Defendant's Vice President of Claims, William Keeling, testified that with respect to the 1999 Policy "[c]laim is a defined term in the policy...[i]f the definition of the term claim in the policy is met, then the duty to defend is triggered." [Plaintiff's Summary Motion, Exhibit E, p.57]. Contrary to Defendant's argument that the change in language between the 1998 and 1999 Policy Forms with respect to the duty to defend had no

15

effect, Keeling testified that "one could probably make the scope of the coverage agreement in 6/99 policy as to defense might be broader in the general context than the 3/98 edition. *Id*. at pp.53-54. This is consistent with the plain language of the contract.

Accordingly, the 1999 Policy adoption broadened the duty to defend to all claims, which includes Plaintiff's SEC and Michigan licensing agency claims.

### 2. Supplemental Benefit

Defendant argues that it is "patently clear that disciplinary proceedings are subject to a $25,000 sublimit for claims like the Michigan licensing agency proceeding that are typically not covered under professional services policies and only seek relief that is expressly excluded from coverage under the policy." [Defendant's Motion for reconsideration, p.3]. Defendant fails to identify where the 1998 or 1999 Policy expressly excludes the relief sought by Plaintiff. The 1998 Policy provides:

> C. Defense of Disciplinary Proceedings
>
> 1. <u>Coverage</u>.
> As provided in this subpart C, the Company further agrees to pay a portion of expenses reasonably incurred by the Insured in connection with the defense of certain disciplinary proceedings.
> Proceedings for which a defense shall be afforded include disciplinary actions before the Securities and Exchange Commission, or state licensing authorities which may involve a reprimand, or suspension or revocation of a license or other authority to engage in the practice of accountancy...
> * * *
>
> 2. <u>Insured's Rights and Duties</u>.
> The Insured shall have the right and duty to select counsel for the defense of disciplinary proceedings and shall have the exclusive right to conduct the defense of the disciplinary proceedings, including, the sole right to settle such proceedings. As a condition of coverage, the Insured agrees to consult with the Company concerning the selection of defense counsel. Nothing herein authorizes the insured to make any payment, admit any liability, settle any Claim, assume

> any obligation, or incur any expense without the advance written consent of the Company.
> This coverage is limited by the terms, conditions and exclusions of the Policy.
>
> 3. <u>Limits of Coverage</u>.
> Coverage hereunder shall be afforded up to a maximum of $25,000.00 per covered disciplinary proceeding.
> * * *

[Plaintiff's Motion, Exhibit A, p.2]. The 1999 Policy Form provides:

> F. Supplementary Benefits
>
> * * *
> 2. Regulatory Inquiry
> If, during the Policy Period, any board, self-regulatory body or a governmental agency with the authority, or agency with regulatory authority over the Named Insured initiates an inquiry or investigation of the Named Insured during the Policy Period, we agree to pay Fifty percent (50%) of Your attorney fees, attorney cost and court cost, up to a maximum of $25,000 per such proceeding, and no deductible shall apply to this coverage.

[Plaintiff's Motion, Exhibit B, p.5].

Defendant asserts that the $25,000 limit applies to the Michigan licensing agency proceedings. Presumably, in light of this ruling, Defendant would also assert this argument regarding Plaintiff's claims for the SEC litigation. Nothing in these provisions expressly excludes Plaintiff's SEC and Michigan licensing agency proceedings from coverage under the policy. It is clear from the language of both the 1998 and 1999 Policies, that the $25,000 is a supplemental benefit. Supplemental is defined as "[s]upplying something additional; adding what is lacking." BLACK'S LAW DICTIONARY (8th ed. 2004). The supplemental benefit for disciplinary proceedings covers costs that are not covered under the general portion of the policy, it does not provide that disciplinary proceedings are otherwise excluded from coverage under the policy where they meet the definition of a claim.

17

To the extent Defendant contends the supplemental benefit is an exclusion from coverage, "[e]xclusionary clauses are to be strictly construed against the insurer." *Taylor v. Blue Cross/Blue Shield of Michigan*, 205 Mich.App. 644, 649 (Mich.App. 1994). The reason for this policy is that insurance companies are typically the drafters of insurance agreements, if they want to escape liability, it is incumbent on them to make clear the extent of nonliability under the exclusion clause. *Century Indemnity Company v. Schmick*, 351 Mich. 622, 626 (1958).

In the 1998 Policy, coverage is defined and Defendant agrees to pay all damages arising from claims; the policy defines its duty to defend as including suits against the insured seeking damages payable under the policy. The 1998 Policy goes on to state that Defendant "further agrees" to pay a portion of the expenses incurred in the defense of certain disciplinary proceedings. [Exhibit A, p.2]. The disciplinary proceedings are defined as actions that may involve "reprimand, or suspension or revocation of a license or other authority to engage in the practice of accountancy." *Id*. This supplemental coverage was not designed to cover actions demanding money and/or services, because those would be covered as claims. The 1999 Policy is similar. It begins by defining a claim and the coverage agreement, which provides Defendant has a duty to defend any claim. [Exhibit B, p.3]. In the limits of liability section, under the heading supplementary benefits, Defendant states that it will pay $25,000 towards attorney fees and costs for any "board, self-regulatory body or governmental agency" that initiates an inquiry or investigation. *Id*. at 5. Because an inquiry or investigation can be less than a suit that demands money or services, this provides supplemental coverage where the inquiry or investigation does not meet the definition of a claim.

It is clear and unambiguous in both the 1998 and 1999 Policies that the $25,000 coverage

18

was intended to be supplementary. It provides additional coverage where a particular proceeding does not meet the definition of a claim so that it is not otherwise covered under the policy. Defendant confirms this interpretation in its Motion where it states "[t]he CPA Mutual Policy is unique, in that unlike other professional services policies, it provides its insureds with supplemental coverage in the amount of $25,000 for disciplinary proceedings that are ***not otherwise covered*** or seek otherwise uncovered relief." [Motion, p.1](emphasis added). Under the terms of the policies, a disciplinary proceeding can be "otherwise covered" if it meets the definition of a claim. That is the case here, and the supplemental benefit is inapplicable.

Because the Court does not find either policy ambiguous, it does not consider the extrinsic evidence offered. Nonetheless, the Court does point out that Defendant directs the Court to a letter it sent Plaintiff on October 22, 2004, informing Plaintiff of its position that under either the 1998 or 1999 Policy Form, the coverage for a disciplinary proceeding was limited to $25,000. [Plaintiff's Motion, Exhibit C]. However, Plaintiff submitted a letter from Defendant written May 7, 2003, in which Defendant states that it cannot give a formal coverage position until the SEC actually filed documents, but that it preliminarily believed that the SEC proceeding did not constitute a claim *because it was not a demand for money or services*. [Plaintiff's Motion, Exhibit I, p.3](emphasis added). This implies that a disciplinary proceeding can constitute a claim where there is a demand for money or services.

Accordingly, Defendant has a duty to defend Plaintiff's claims arising from the SEC proceeding and the Michigan licensing proceeding as it would any other claim under the 1999 Policy Form. In addition, Plaintiff is entitled to recover Young & Susser's fees and the fees for 'Mr. Murovitz" because they constitute claim expenses of the MCA/SEC litigation.

## IV.     CONCLUSION

For the foregoing reasons, the Court **GRANTS**, in part, and **DENIES** in part, Plaintiff's Motion for reconsideration; and **GRANTS**, in part, and **DENIES** in part, Defendant's Motion for Reconsideration.  Based on the Court's reconsideration, Plaintiff's Motion for summary judgment is **GRANTED** in part, and **DENIED**, in part.  Likewise, Defendant's Motion for summary judgment is **GRANTED** in part, and **DENIED,** in part.  Plaintiff's Motion is granted regarding Plaintiff's claim for breach of policy agreement to the extent it alleges the SEC and Michigan licensing matters constitute claims under its policy with Defendant. It is also granted to the extent that Plaintiff seeks to recover attorney fees paid to Young & Susser, and costs to 'Mr. Murovitz' as claim expenses.  Defendant's Motion is granted regarding Plaintiff's claims of unfair trade practices and violation of Michigan insurance statutes.

**IT IS SO ORDERED.**

**S/Sean F. Cox**
**Sean F. Cox**
**United States District Judge**

**Dated:  July 18, 2007**

**I hereby certify that a copy of the foregoing document was served upon counsel of record on July 18, 2007, by electronic and/or ordinary mail.**

**S/Jennifer Hernandez**
**Case Manager**